616 So.2d 1017 (1993)
Sheila Diane COLEY, Appellant,
v.
The STATE of Florida, Appellee.
No. 90-2182.
District Court of Appeal of Florida, Third District.
March 16, 1993.
*1018 Lubin and Gano, and Thomas C. Gano, West Palm Beach, for appellant.
Robert A. Butterworth, Atty. Gen., and Mark S. Dunn, Asst. Atty. Gen., for appellee.
Before BASKIN, COPE and GERSTEN, JJ.
COPE, Judge.
Sheila Diane Coley appeals her convictions and sentences for sexual battery upon a person twelve years or older while physically helpless to resist, and two counts of conspiracy to commit sexual battery. We reverse.

I.

A.
Coley was charged with one count of sexual battery on a person twelve years or older while physically helpless to resist, and two counts of conspiracy to commit sexual battery. A codefendant, Harold Bullington, was charged with the same crimes. In addition Bullington was charged with delivery, and conspiracy to deliver, cocaine.
Coley was tried separately and convicted. The principal question presented is whether there was sufficient evidence to convict Coley of the crimes charged.
On appeal of a conviction in a criminal case, the test for sufficiency of the evidence is whether "a rational trier of fact could have found proof of guilt beyond a reasonable doubt." Melendez v. State, 498 So.2d 1258, 1261 (Fla. 1986) (citing Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)); accord Kaufman v. State, 429 So.2d 841 (Fla. 3d DCA 1983) (citing Jackson); D.M. v. State, 394 So.2d 520, 521 (Fla. 3d DCA 1981) (citing Jackson). As stated in Jackson,
[T]he Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction `except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' ...
... .
... [T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to `ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.' ... Instead, the relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. ... The criterion thus impinges upon `jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law.
Jackson v. Virginia, 443 U.S. at 315, 318-19, 99 S.Ct. at 2788-89, 61 L.Ed.2d at 571, 573-74 (footnotes and citations omitted; emphasis added).[1]See also Lynch v. *1019 State, 293 So.2d 44, 45 (Fla. 1974); Stewart v. State, 158 Fla. 753, 757-58, 30 So.2d 489, 490-91 (1947); Weinshenker v. State, 223 So.2d 561, 563 (Fla. 3d DCA), cert. denied, 225 So.2d 918 (Fla.), cert. denied, 396 U.S. 973, 90 S.Ct. 462, 24 L.Ed.2d 441 (1969).
If the evidence is insufficient under the foregoing standard, then the convictions must be reversed.

B.
For purposes of determining the sufficiency of the evidence, our review is confined entirely to the record in Coley's case alone. The dissent filed in this case includes a lengthy discussion of the evidence in the separate trial of Bullington. As there are differences in the witnesses and testimony at the two trials  including differences in the testimony of the victim in the two trials  we confine our attention to the record from Coley's trial, not Bullington's, "to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. at 318, 99 S.Ct. at 2788-89.[2]

II.
Coley was convicted of two counts of conspiracy to commit sexual battery. The panel is unanimous that there was no evidence to show the existence of a conspiracy under subsection 777.04(3), Florida Statutes (1989). See Ashenoff v. State, 391 So.2d 289, 291 (Fla. 3d DCA 1980). The convictions for conspiracy are reversed.

III.
The next question is whether there is sufficient evidence to sustain Coley's conviction on the sole remaining charge, sexual battery.
Count I of the Second Amended Information charged Coley and codefendant Bullington with committing "sexual battery upon S.E.M., a fifteen-year-old juvenile, without the victim's consent, while the victim was physically helpless to resist, contrary to Section 794.011(4)(a), (d), Florida Statutes...."[3]
Coley argues that the State failed to prove essential elements of the crime  that the victim was "physically helpless to resist" within the meaning of the statute and that the sexual acts took place without S.E.M.'s consent. We agree.
The elements of a sexual battery under paragraph 794.011(4)(a), Florida Statutes (1989), are as follows:
(1) a sexual battery as defined by section 794.011(1)(h), Florida Statutes ..., is committed;
(2) The act was not consented to; and
(3) The victim was physically helpless to resist.
Gould v. State, 577 So.2d 1302, 1304 (Fla. 1991).
We first consider whether there was sufficient evidence to establish the third element beyond a reasonable doubt, namely, that the victim was physically helpless to resist. The phrase, "physically helpless *1020 to resist," is a misnomer. The phrase suggests that it applies where, as here, the victim is tied up, but in fact the phrase has nothing at all to do with being physically restrained.[4]
The statute gives "physically helpless to resist" an unusual and very limited definition. "The term `physically helpless' means that a person is unconscious, asleep, or for any reason physically unable to communicate unwillingness to an act." § 794.011(1)(e), Fla. Stat. (1989) (emphasis added). In order to prove this element, the State must show beyond a reasonable doubt that the victim was physically unable to communicate unwillingness, by reason of sleep, unconsciousness, or otherwise. It is the settled interpretation of the statute that being tied up does not meet this element of the offense; if the victim, although physically restrained, can communicate unwillingness, then this element is not satisfied. Gould v. State, 577 So.2d at 1305, aff'g in part, quashing in part, 558 So.2d 481, 483 (Fla. 2d DCA 1990); Norman v. State, 555 So.2d 1316, 1317 (Fla. 5th DCA 1990); Davis v. State, 538 So.2d 515, 516 (Fla. 2d DCA), review denied, 544 So.2d 201 (Fla. 1989).
In light of those principles, we examine the facts of this case. The victim, S.E.M., had run away from home and was living with a female roommate in Tampa. S.E.M. met Stephen Lackey, with whom she developed a sexual relationship. Although fifteen years old, S.E.M. told everyone she was nineteen.
S.E.M. and Lackey went to the Florida Keys with Lackey's stepfather, Bullington,[5] Coley, S.E.M.'s roommate, and several other people.[6] During their stay in the Keys, the group consumed alcohol and cocaine. S.E.M. engaged in consensual sexual acts with Lackey, including S.E.M.'s being tied up at her request for sexual activity.
On the date in question, S.E.M. and several of the other persons voluntarily consumed cocaine which was on a plate in the motel room. At some point S.E.M. stated that she would like to try sex with a woman. Sexual activity followed, with defendant Coley engaging in two acts of oral sexual contact with S.E.M. while S.E.M. was tied to the bed.[7]
The initial question is whether the evidence was sufficient to show that during this episode S.E.M. was physically helpless to resist as defined in the statute, i.e., physically unable to communicate unwillingness. We conclude that there was no such evidence.
Two witnesses testified at trial regarding this episode, S.E.M. and Lackey.[8] The testimony shows that S.E.M. was physically able to communicate at all relevant times. The entire episode began with a communication between S.E.M., Coley, and others, in which S.E.M. expressed a desire to have sex with a woman. (Tr. 117, 121). S.E.M. was neither asleep nor unconscious, for she described each of the sexual acts on which the State based its case. (Tr. 50-52). Obviously she would not be able to describe the sexual acts charged in the information if she had been unconscious or asleep during them.
S.E.M. also testified that she communicated during each of the acts in question. *1021 She specifically asserted during parts of her testimony that she had communicated unwillingness, while conceding elsewhere in her testimony that she may have consented. (Tr. 51-53, 81, 88, see also Tr. 117, 121). The testimony shows ability to communicate at the relevant times; there is no evidence which would support a finding, beyond a reasonable doubt, of a physical inability to communicate unwillingness.[9]
Coley's conviction of sexual battery on a person physically helpless to resist must be reversed.[10]

IV.
Given that there is insufficient evidence to support the conviction under paragraph 794.011(4)(a), Florida Statutes, the next question is whether the offense may be reduced to a lesser included offense under authority of section 924.34, Florida Statutes (1989). That statute provides, in part,
When the appellate court determines that the evidence does not prove the offense for which the defendant was found guilty but does establish his guilt of . .. a lesser offense necessarily included in the offense charged, the appellate court shall reverse the judgment and direct the trial court to enter judgment for ... the lesser included offense.
Id.
In Gould v. State, the Florida Supreme Court held that the statute only allows an appellate court to reduce the offense to a necessarily included lesser offense, not to a permissive lesser included offense. 577 So.2d at 1304-05 & n. 6.[11]
Gould also holds that the necessarily lesser included offense for paragraph 794.011(4)(a) is battery. 577 So.2d at 1305.[12] The question is whether there is sufficient evidence to support conviction on that charge.
Insofar as pertinent here, "[a] person commits battery if he ... [a]ctually and intentionally touches ... another person against the will of the other... ." § 784.03, Fla. Stat. (1989). In this case the victim testified that the episode started out as consensual sexual activity. (Tr. 50, 51, 75). She testified, however, that at some point during the sexual activity she said no, i.e., that she wanted the sexual activity to stop. (Tr. 51-53, 88). However, on cross-examination S.E.M. also testified that she may have consented with regard to each of the sexual acts that took place. (Tr. 81, 88, see also Tr. 109, 121, 125).
*1022 The applicable standard for sufficiency of the evidence is that the evidence must "reasonably support a finding of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. at 318, 99 S.Ct. at 2788-89. Here, S.E.M. conceded that she may have given consent to the acts in question. That concession gives rise to a reasonable doubt with respect to the offense of battery.
The argument is made that there could be no consent for purposes of the battery statute because defendant was forced to consume cocaine. If there were such evidence we would have a different case, but all of the evidence indicates that the victim's consumption of cocaine was entirely voluntary. S.E.M. testified:
Q. Did anyone force you to take the coke?
A. No.
Q. You were allowed to have it if you wanted it or you could leave it if you didn't want it?
A. Yes.
* * * * * *
Q. You did it voluntarily?
A. Yes.
* * * * * *
A. It was sitting in the middle [of] the bed [on a plate], and we would use it as we wanted to.
(Tr. 72, 74, 82). During the sexual episode, at one point Bullington held the plate up to S.E.M.'s nose for her to inhale. (Tr. 103-04). There was no testimony that any of the cocaine consumption was involuntary.
It is also argued that there could be no consent for purposes of the battery statute because of S.E.M.'s voluntary cocaine consumption. In order to examine this contention it must first be noted that the law distinguishes between involuntary and voluntary alcohol or drug use for purposes of determining the voluntariness of a consent.
By way of overview, the American Law Institute states:
Common-law authorities treated intercourse with an unconscious woman as rape and occasionally expanded this rule to cases where the female was not technically unconscious but was so incapacitated by alcohol or drugs as to be in a condition of utter insensibility or stupefaction. Most current statutes, however, differentiate unconsciousness from lesser impairment and require in the latter case that the drug or intoxicant be administered by or with the privity of the defendant in order to constitute the highest degree of forcible rape.
American Law Institute, Model Penal Code and Commentaries Part II, § 213.1, at 317 (1980).
The Florida sexual battery statute provides that evidence of mental incapacity resulting from involuntary drug or alcohol consumption "is admissible to prove that the consent was not intelligent, knowing, or voluntary... ." § 794.011(6), Fla. Stat. (1989); id. § 794.011(1)(a), (c). The theory of the statute is that defendant has administered the drug or alcohol without the consent of the victim, and accordingly the defendant is held accountable where the drug or alcohol renders the victim "temporarily incapable of appraising or controlling his or her conduct... ." Id. § 794.011(1)(c).[13]
There is, however, no comparable provision in the sexual battery statute relating to voluntary consumption of drugs or alcohol. The question whether voluntary drug or alcohol consumption will vitiate the voluntariness of consent is a difficult issue under decisional law and under the criminal codes. Plainly as a matter of statutory *1023 construction, the Florida sexual battery statute does not place voluntary drug or alcohol consumption on the same footing as involuntary consumption; if they were to be treated as equivalent, the statute would say so.
The prevailing view is that voluntary consumption of drugs or alcohol does not, without more, render consent involuntary. Rollin M. Perkins & Ronald N. Boyce, Criminal Law 218 (3d ed. 1982) "The mere fact that alcohol or drugs have confused the victim's judgment or reduced inhibitions is not enough... ." Id. There must be a showing that the victim was unable to give a knowing and voluntary consent, and  in order to charge defendant with criminal responsibility  that the inability to consent was known or apparent to the defendant. See id. at 212-13; 1 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 5.11 (1986).[14]See generally American Law Institute, Model Penal Code and Commentaries Part I, § 2.11, at 689 (1985); Part II, § 213.1 Comments 3 & 5 (1980); 3 Charles Torcia, Wharton's Criminal Law § 289 (1980).
Here, there is a dearth of evidence on which to hold defendant criminally accountable. On the night in question, S.E.M. began consuming cocaine alone before joining the group. By the victim's own account, she knew what she was doing when the encounter started. While the state elicited much testimony about the victim's subjective state of mind, there is an absence of evidence to show defendant knew, or that it was apparent to defendant, that the victim was unable to give a knowing and voluntary consent. As to the victim's age, it is uncontroverted that S.E.M. had represented that she was an adult, and that no one knew the victim's true age until after the incident in question.[15] For the reasons stated, the evidence is insufficient to support the necessarily lesser included offense of battery.

V.
Alternatively, if it is assumed arguendo that the evidence was sufficient to show absence of knowing consent, and therefore that defendant is guilty of battery, defendant is still entitled to be discharged at this time. Defendant has served the term required for battery, a first degree misdemeanor.

VI.
We conclude that the law requires reversal of the defendant's convictions. We have carefully considered the position advanced by the dissent, and have reexamined the record in light thereof. Having done so, we adhere to the view that the evidence was legally insufficient to convict the defendant.
We note that in the present case the State could have made the main charge against defendant the offense of lewd, lascivious or indecent act upon or in the presence of a child, in violation of section 800.04, Florida Statutes (1989). That crime is a second degree felony in which consent is not a defense and ability to communicate is not an issue. The State elected to proceed under paragraph 794.011(4)(a), Florida Statutes (1989), a first degree felony. When the State did so, it was obliged to prove each essential element of the charged offense beyond a reasonable doubt. The evidence presented was insufficient to discharge that burden with respect to the offense charged and the battery offense necessarily included therein.
As this court has stated in another insufficiency-of-evidence case:

*1024 This reversal should not be interpreted, however, as condoning the [defendant's] behavior... . We only hold that this behavior, without more, was insufficient to adjudicate [defendant guilty of the offense charged]... . Our law, for reasons deeply rooted in our ... devotion to human freedom, has always set high standards of proof for the state to meet before we condemn a person for violating our criminal laws... . We do no more than follow that decisional law in this cause believing, as we do, that no person  whatever one may think of him [or her] personally  should be stigmatized by a criminal conviction ... based, as here, upon less than proof beyond a reasonable doubt.
D.M. v. State, 394 So.2d at 520 (citing Jackson v. Virginia).
The convictions are reversed and the matter remanded with directions to discharge the defendant from the cause.
Reversed and remanded.
BASKIN, Judge (concurring).
I concur in the majority opinion authored by Judge Cope because it correctly applies the law. The dissent's references to another defendant's separate trial and to witnesses who are not part of the record in the case before us are inappropriate and not legally worthy of consideration.
If the record in this case does not support the verdict, and the law has not been correctly applied, this court is compelled to reverse the conviction. As that is the case here, I agree that reversal of Coley's conviction is mandated.
GERSTEN, Judge.
I concur in part, and respectfully dissent in part.

PREFACE
This opinion encompasses two cases: Sheila Coley v. State, Case No. 90-2182 (Coley), and Harold Bullington v. State, 616 So.2d 1036 (Bullington). Coley and Bullington were codefendants below.
Normally, one does not find a dissent which covers two separately tried jury cases. Yet, here, the facts although not identical, relate to the same incident. Thus, for both ease of reading and writing, I have combined facts from both cases in the "General Facts" section. However, I have meticulously separated the facts in the discussion of the defendants' individual cases.
Further, to lessen the chance that this case will be used for its explicit and graphic material rather than its legal analysis, I have paraphrased some of the victim's direct testimony in brackets.

I.

INTRODUCTION
Coley was convicted of sexual battery, and two counts of conspiracy to commit sexual battery. Bullington was convicted of sexual battery upon a person twelve years of age or older while helpless to resist, conspiracy to commit anal sexual battery, conspiracy to deliver cocaine, and delivery of cocaine. All convictions stem from the same episode and the same victim, a fifteen-year-old girl.
In both cases, the majority is reversing the convictions for sexual battery and conspiracy. In Coley's case, this court has ordered her completely discharged. In Bullington's case, this court is affirming non-appealed convictions for conspiracy to deliver cocaine, and delivery of cocaine.
I am compelled to dissent because I cannot agree to reverse two separate jury verdicts when each verdict is supported by competent evidence. Instead, I agree with the verdicts of these two separate juries which represent the collective minds of their community. These two juries found these two perpetrators guilty of sexual atrocities upon a minor female.
The facts are difficult to write about. They portray man's ability to inflict cruelty and degradation upon a fellow human being. As horrible as these facts are to write, they must have been unimaginable to live through, especially for the fifteen-year-old female victim.
*1025 The defendants in these two companion cases portray this child-victim, as a streetwise, drug-using, runaway prostitute, who consented to their vile attacks upon her person. Their approach is the hackneyed standby of most rape cases, that: "she asked for it." In this supposedly enlightened age and society which purports to give equality to women, it is time we discard these defendants' contentions of "consent" and affirm their convictions.

II.

GENERAL FACTS
The information filed against the defendants charges both Coley and Bullington with the following crimes: (1) sexual battery upon a fifteen-year-old victim while she was physically helpless to resist, contrary to section 794.011(4)(a)(d), Florida Statutes; (2) conspiracy to commit anal sexual battery; and (3) conspiracy to commit oral sexual battery.
The information further charges Bullington with delivery of cocaine to a person under the age of eighteen and conspiracy to deliver cocaine to a person under the age of eighteen.
The defendants were tried separately and convicted by two separate juries. The child victim, S.E.M., testified at both trials. In Bullington, she said:
Q. Did there come a time you were tied to a bed?
A. Yes.
Q. [S] what happened to you, were you tied face up or face down?
A. Face up I believe.
Q. Is there anybody in the room?
A. I don't know.
Q. Is Diane in the room?
A. Yes.
Q. Do you have any clothes on?
A. No.
Q. Does Diane have any clothes on?
A. No.
Q. What happened to you after you were tied up?
A. I don't recall a lot of it.
* * * * * *
Q. What happened after you were tied up on the bed?
A. Diane got on top of me. First we were talking I believe. Then ... [victim describes an oral sex act and an act of anal sodomy with an electrical appliance] ...
Q. Did you want them to do this?
A. No.
Q. While they were doing that do you remember where the plate of cocaine was?
A. In front of me. At first it was in front of me then after a little while it was in front of me.
Q. Under your face?
A. Yes.
Q. Who was holding the plate of cocaine?
A. I believe Harold got it out of the drawer but I don't believe anyone was holding onto it.
Q. Did he put the plate of cocaine under your nose?
A. I believe so.
Q. What was Belinda doing while this was going on?
A. I believe she was ... [the victim describes a sex act with an electrical appliance] ... or spanking me.
* * * * * *
Q. Had you ever ... [the victim states that she never participated in any act of anal sodomy] ...
Q. Did you want them to do this to you?
A. No.
Q. [S], were you conscious throughout the whole period of time?
A. No.
Q. Tell us what it was like, how much of it you were conscious of and how much were you not?
A. I can't recall. I can't recall a lot of things. I don't recall.
Q. Did you pass out from time to time?
A. Yes.
Q. Did you have any idea how long you were passed out when this happened?
A. No.

*1026 Q. When you came to, did they give you more cocaine?
A. I believe so. In the morning I remember I woke up and I was sleeping upstairs. I don't know how I got upstairs. I don't remember.
Q. The next morning do you recall how you felt when you woke up?
A. Yes.
Q. Tell us how you felt?
A. I was scared and hurt. I was really sad and upset.
Q. What were you scared of?
A. Of that happening again.
Q. Did you tell Steve anything or give Steve instructions about that sort of thing?
A. Yes, I did.
Q. What did you tell Steve?
A. I asked him not to leave me alone anymore.
* * * * * *
Q. At the time that you were in that bedroom and the plate of cocaine was being held under your nose, was there any way you could have avoided taking it?
A. I don't know.
Q. At one point in time did your face fall down in the plate of cocaine?
A. Yes, it did.
Q. Did you voluntarily drop your face into that plate of cocaine?
A. I doubt it.
Q. Were you physically capable of being able to talk after that situation again?
A. Not really.
Q. Was that because of the effects of the cocaine?
A. Yes.
Contrary to the perception promoted by the defendants and accepted by the majority, although S.E.M. had used cocaine previously she was not the consummate user. She testified that she had never snorted it. In Coley she said:
Q. Have you used cocaine before?
A. Yes.
Q. About how many occasions?
A. Once in a while I did on the weekend. I never snorted it.
Q. Never snorted it before?
A. No.
Q. About how far back did that go, that you used cocaine on the weekend?
A. About a month.
* * * * * *
Q. You never snorted coke before you met these people.
A. No.
Codefendant, Steve Lackey, was asked how long S.E.M. had been given cocaine. He testified in Coley:
Q. Do you know how much cocaine [the victim] had?
A. All night.
Q. What?
A. All night.
Q. Had she had more than the others?
A. She had done a lot, yeah. She had quite a bit that night.
An employee of the hotel testified about the bloodied linen which had to be discarded:
The downstairs bedroom had blood on the comforter and sheets. In the upstairs bedroom only on the sheets, the comforter was thrown on the floor.
A friend of the victim testified about the attack. In Bullington she said:
Q. When you got out of bed, what did you see?
A. I seen Harold and Diane and Belinda doing all kind of things to [S].
* * * * * *
Q. Was [S] tied down?
A. Yes.
Q. What was Belinda doing?
A. She was spanking [S] on the butt.
Q. What was she spanking her with?
A. A shoe.
Q. What was Diane doing? ... [witness testifies about the electrical appliance used in the sexual battery] ...
Q. What was Harold doing?
A. He was sitting on the bed.
Q. Did Harold have any cocaine at the time?

*1027 A. Yes.
Q. How was the cocaine, was it in a bag?
A. On the plate.
Q. Did you see Harold give any of that cocaine to [S]?
A. Yes.
Q. How did he do that?
A. He put a plate under her face.
Q. Could you tell, was [S] talking at all?
A. No.
Q. Was she making any sound at all?
A. She was screaming, hollering a little bit, not much.
Q. Have you ever witnessed a scene like that before that time?
A. No.
* * * * * *
Q. The next day, could you tell us what type of condition [S] was in?
A. She was upset.
Q. Did there come a time you were asked to wash some sheets?
A. Yes.
Q. Which sheets were these?
A. The ones on Harold's bed.
Q. Who helped you wash them?
A. Me and Steve.
Q. Who told you to wash them?
A. Harold.
Q. What was on the sheets?
A. Blood, ... [a food substance used in a sex act]... and all of that.
Q. Was there any feces on the sheets?
A. Yes.
Q. The day after that happened, did you discuss this at all or have any conversation at all with the defendant about it?
A. No.
Q. Did the defendant ever say anything to you about what happened?
A. No.
Q. How upset was [S] that morning?
A. She was very upset.
Q. Was she crying?
A. Yes.

III.

STANDARD OF REVIEW
Though time-worn and often-quoted, the inveterate maxim of law is:
[T]he question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and where there is substantial, competent evidence to support the jury verdict, we will not reverse a judgment based upon a verdict returned by the jury.
Heiney v. State, 447 So.2d 210 (Fla.), cert. denied, 469 U.S. 920, 105 S.Ct. 303, 83 L.Ed.2d 237 (1984). It is to this rule that we have pledged our fidelity.
This appellate court must assume that two juries "believed that credible testimony most damaging to the defendant and drew from the facts established those reasonable conclusions most unfavorable to the defendant." E.Y. v. State, 390 So.2d 776 (Fla. 3d DCA 1980) (quoting Parrish v. State, 97 So.2d 356 (Fla. 1st DCA 1957), cert. denied, 101 So.2d 817 (Fla. 1958)).
Finally, the trial court determined the sufficiency of the evidence against these defendants and denied their motions for judgment of acquittal. In reviewing the denial of a motion for judgment of acquittal:
The proper test on appeal ... is whether the jury as the trier of fact might reasonably conclude that the evidence excluded every reasonable hypothesis but that of guilt. Rodriguez v. State, 379 So.2d 657 (Fla. 3d DCA 1980); Zuberi v. State, 343 So.2d 664 (Fla. 3d DCA 1977). All facts introduced into evidence are admitted by the defendant, and the court must draw every conclusion favorable to the State. Codie v. State, 313 So.2d 754 (Fla. 1975); Rodriguez v. State, supra; Matrascia v. State, 349 So.2d 735 (Fla. 3d DCA 1977), cert. denied, 360 So.2d 1249 (Fla. 1978).
Knight v. State, 392 So.2d 337 (Fla. 3d DCA), review denied, 399 So.2d 1143 (Fla. 1981).

IV.

THE COLEY MAJORITY
Here, the majority reweighs the evidence, disbelieves the prosecution evidence *1028 and finds that it would not have convicted. The majority misconstrues the role of an appellate court:
Although the appellate courts in the not so distant past reweighed and closely scrutinized the testimony of a victim of rape or sexual battery and frequently reversed convictions because the appellate court disbelieved the complaining witness, the Florida Supreme Court has wisely put a stop to that practice. In sexual battery cases as well as any other kind of criminal case, the appellate court must determine: After all conflicts in the evidence and all reasonable inferences therefrom have been resolved in favor of the verdict on appeal, whether there is substantial competent evidence to support the verdict and judgment. Legal sufficiency alone, as opposed to evidentiary weight, is the appropriate concern of the appellate tribunal.
McIlwain v. State, 402 So.2d 1194 (Fla. 5th DCA 1981), review denied, 412 So.2d 467 (1982) (quoting Tibbs v. State, 397 So.2d 1120 (Fla. 1981), affirmed, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982)).
In order to reverse under the correct standard of review, this court must find that after viewing any conflicting evidence in the light most favorable to the jury's verdict, there is no substantial, competent evidence to support the verdict in this case. Heiney v. State, 447 So.2d at 212; Perez v. State, 479 So.2d 266 (Fla. 5th DCA 1985). This, in turn, requires a conclusion that both the jury and judge behaved unreasonably when Coley was convicted.
The majority states that for purposes of the sufficiency of the evidence, their review is confined entirely to the record in Coley's case. However, in making that assertion, the majority leaves the impression that there was no evidence against Coley, and therefore Coley's conviction must be reversed.[1]
In fact, all the quotations included in this section come directly from testimony in Coley's trial. The majority either misperceives this testimony, or chooses to ignore it in an attempt to make a case for insufficiency of the evidence. In any event, the majority fails to address why the graphic testimony of the victim is insufficient to convict; why her assertion that she did not consent is unbelievable; and why the majority shifts the burden from appellant to the victim.

A.

CONSENT
Consent is defined in Section 794.011(1), Florida Statutes (1989):
The term "consent" means intelligent, knowing, and voluntary consent and shall not be construed to include coerced submission.
To be valid, consent must be voluntary, and the question of voluntariness must be determined from the totality of the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); Zeigler v. State, 402 So.2d 365 (Fla. 1981); Denehy v. State, 400 So.2d 1216 (Fla. 1980).
The majority maintains that the victim in this case consented to all the activities during the episode: (1) the initial use of drugs; (2) the sexual acts; (3) the introduction of additional drugs during the episode; and, (4) the sexual acts after the ingestion of additional drugs.
It is uncontroverted that the victim engaged in the use of cocaine with the perpetrators for some time before the sexual episode. Therefore, any possible consent given at the beginning of the sexual episode by the already intoxicated minor victim was invalid because clearly she was unable to intelligently, knowingly, or voluntarily consent to the activities to which she was subjected. See, e.g., Commonwealth v. Ascolillo, 405 Mass. 456, 541 N.E.2d 570 (Mass. 1989); see also 3 Wharton's, Criminal Law § 299, at 107 (14th ed. 1978).
*1029 The validity and voluntariness of any consent has to be evaluated based on the victim's particular abilities and knowledge. See, e.g., Saavedra v. State, 576 So.2d 953 (Fla. 1st DCA 1991). In this case we also have to take into consideration her preexisting intoxication, as well as her age. All these factors resulted in a diminished capacity to give an intelligent, knowing and voluntary consent.
The victim testified at Coley's trial:
Q. Up to this time had you slept with anyone other than Steve Lackey in that room?
A. No.
Q. Did you want to sleep with anyone other than Steve Lackey in that group?
A. No.
Q. Did there come a time you were tied to a bed in the master bedroom?
A. Yes.
Q. Tell us what happened after you were tied down?
A. I don't remember much. I remember something about some Cubans. They were just messing around, just like  I don't know. I was on the bed and somebody came in and said something to me. I think I was talking to Diane. I was laying on the bed and said something like: Now you've had your fun, now it's time for us to have ours. Something like that. I don't really remember much.
Q. What happened after that?
A. I remember me and Diane doing something... . [victim describes an oral sex act with a food substance involved]
...
Q. Did you want her to do that?
A. No. I might have agreed to it. I am not sure. I don't think I did. No, I didn't want it to happen because I remember waking up the next morning crying.
* * * * * *
Q. Let's go through it slowly. Do you remember laying on the bed and they were talking about doing it to you anally? How did it get started?
A. I don't remember now. I remember I said I didn't want it to happen. She said something like: Well, you are going to try everything, or something like that, and it just happened.
Q. Did you want that to happen?
A. No.
Q. Could you have stopped it from happening?
A. I don't know.
.....
Q. Do you remember what, if anything, was placed up your anus?
A. Yes, ... [victim describes an electrical appliance] ...
* * * * * *
Q. Did you want them to do this?
A. No.
.....
Q. Did you say no to oral sex?
A. No.
Q. Why 
A. Yes, I did. I said I didn't want to do that anymore?
Q. Who did you say that to?
A. I think I told Diane when we first started. I said, I don't want to do this. I don't want to do it. I remember.
At the close of all the evidence Coley moved for a directed verdict of acquittal. Coley argued that the State failed to prove the elements of the crime because the victim had consented to the activities. The trial court correctly denied the motion, stating:
THE COURT: As [the prosecutor] has accurately pointed out, consent is an issue for the jury's determination except were [sic] there is a totality of evidence to show lack of consent. I don't think that situation exists here. I think based on the testimony, which is in the record, there is a basis for which the jury could find that the consent, if given, lacks the requisite of voluntariness and intelligence. I am going to deny the motion.
"Consent is a relative term to be viewed under the circumstances of each case, ... and is essentially a question for the jury." *1030 Hufham v. State, 400 So.2d 133 (Fla. 5th DCA 1981).
The courts of this state, in scrutinizing the ability of a minor to consent, have held that a minor's valid consent is to be determined: (1) according to that child's abilities, and (2) the totality of the circumstances:
[T]wo important factors to consider in determining valid consent by a child are the age of the child and the scope of the consent given. Consent must be given freely and voluntarily in order to be valid; such a determination is a question of fact to be gleaned from the totality of the circumstances.
Saavedra v. State, 576 So.2d at 959 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)).[2]
Because the jury considers all these factors in determining consent, the prosecutor argued to the jury:
Look at some of the factors that go into making a consent intelligent and voluntary. The age of the person giving consent. [The victim] was 15 years old. [The victim] didn't have the worldliness of the people that were abusing her. Remember, these are people who are out there and have been out there dancing in strip joints. A man that uses women to work for him and to support him and two women that slept with him every night in the same bed. They were a lot more worldly that [sic] the 15 year old [victim]. She was no match for them.
Her education. She quit high school after only one year. She doesn't have the knowledge she needs to combat people as worldly as they are. Her experience comes from a little town in North Central Florida. [She] goes down to the big city of Tampa. [She] just ended up getting herself in a position where she didn't have the experience to deal with what was going on. In other words, did she have the experience to given [sic] an intelligent and knowing consent?
The victim discussed the effects of cocaine on her decision-making process:
Q. How much coke did you use?
A. I can't say.
Q. Did you know what you were doing at that particular point?
A. At first.
Q. You know what was going on around you?
A. At first.
Q. Did it make you sharp and comprehend things around you?
A. No.
Q. Can you make decisions at that particular point?
A. Repeat the question.
Q. Can you make a decision, yes or no as far as anyone doing anything to you?
A. It is hard to make a decision under the influence of cocaine; a good decision.
In spite of this evidence clearly indicating the victim's lack of consent, this majority finds that the victim consented to the sexual activity. However, it is not the province of this majority to make such a finding. Heiney v. State, 447 So.2d at 212. The question of whether consent existed rested, and still rests, with the jury, not this court. Id. This jury resoundingly rejected the defense of consent.

B.

ABILITY TO COMMUNICATE

UNWILLINGNESS
The majority contends that the victim not only gave her consent initially, but that she could have withdrawn that consent, and failed to do so. Concomitantly, the majority suggests that the victim did, in fact, communicate her unwillingness to commit the acts. In addition to the inconsistency of taking both positions, the majority disregards *1031 the victim's initial intoxication, and its effect on her ability to give a knowing consent.
In Commonwealth v. Ascolillo, the Massachusetts Supreme Court recognized that consent must be assessed in light of the victim's intoxication at the time of the consent:
The defendant argues that [the judge's instruction concerning the victim's intoxication] was wholly inapplicable in this case and was not warranted by any view of the evidence. We disagree. The defendant's own testimony suggested that the victim may have been so intoxicated by drugs and alcohol as to be incapable of consenting.
Commonwealth v. Ascolillo, 405 Mass. at 456, 541 N.E.2d at 575-576.
The majority further ignores the forced feeding of additional drugs throughout the evening. Thus, assuming, arguendo, that the initial ingestion and sexual acts were voluntary, the victim was rendered incapable of "communicating" any withdrawal of consent after the forced ingestion of additional drugs.
Finally, the majority assumes that because the child was able to speak, she was able to: (1) give a valid consent; (2) communicate unwillingness to participate in the acts; and (3) withdraw her initial consent. However, the majority fails to consider that one's ability to speak is separate and distinct from one's ability to "communicate".
Section 794.011 takes into account such an inability to "communicate" based on the statute's definition of "mentally incapacitated":
"Mentally incapacitated" means that a person is rendered temporarily incapable of appraising or controlling his or her conduct due to the influence of a narcotic, anesthetic or intoxicating substance administered to that person without his or her consent or due to any other act committed upon that person without his or her consent.
§ 794.011(1)(c), Fla. Stat. (1989). The statute does not deprive the victim of the ability to prosecute a sexual battery solely because she had the ability to speak.
Recognizing that a victim can be unable to "appraise or control her conduct" due to the influence of an intoxicating substance, the statute provides for the possibility that although a victim is able to speak, she may still be unable to communicate any unwillingness, based on her intoxication.
In McIlwain v. State, 402 So.2d at 1194, a defendant was convicted of sexual battery on a seventeen-year-old boy. The defendant was a dentist who had administered nitrous oxide or "laughing gas," used hypnosis on the child, and then abused him. The seventeen-year-old child testified that he was conscious and aware of what the defendant was doing. Like this case, the child was not rendered unresponsive. The court held:
There is sufficient evidence in this record to support the jury's finding that the victim did not intelligently consent to the battery because of his youth, inexperience, and the effects of the hypnotism and nitrous oxide. We also conclude that there is sufficient evidence to sustain the jury's finding that the victim was, because of those same factors, "physically unable to communicate his unwillingness" to the battery and thus he was "physically helpless to resist." In this case both were jury questions.
McIlwain v. State, 402 So.2d at 1197.
In this case, the victim did not intelligently consent to the sexual battery because of her youth, inexperience, and the effects of the cocaine. Accordingly, she was similarly unable to physically communicate her unwillingness, and, thus, was physically helpless to resist. As in McIlwain, both issues were jury questions, which the jury resolved by convicting Coley:
Whether a victim was "physically unable to communicate h[er] unwillingness" and thus was "physically helpless to resist" are factual questions for the jury.
Perez v. State, 479 So.2d 266 (Fla. 5th DCA 1985) (quoting from McIlwain v. State, 402 *1032 So.2d at 1197).[3]
Finally, although the victim was able to talk, she was, without a doubt, impaired:
Q. What was [the victim]'s condition at the time? Did  could she talk and rationalize?
A. She was able to talk. Cocaine does it to you. You do it and you rattle on and on and on. She was high on cocaine.
Again, the majority disregards the standard which mandates that all evidence be taken in the light most favorable to the State. Here, the jury had sufficient evidence to conclude that the victim was unable to give a knowing and informed consent.

C.

PHYSICALLY HELPLESS TO RESIST
The majority's reversal of the defendant's sexual battery conviction is predicated on Coley's contention that the State failed to prove an essential element of the crime; to-wit, that the victim was "physically helpless to resist" within the meaning of section 794.011(1)(e). I cannot agree. The majority opinion has improperly reweighed and re-evaluated the evidence contrary to this court's authority. Tibbs v. State, 397 So.2d 1120 (Fla. 1981), affirmed sub. nom., Tibbs v. Florida, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982).
Section 794.011(1)(e) provides:
The term "physically helpless" means that a person is unconscious, asleep, or for any reason physically unable to communicate unwillingness to an act.

(emphasis added).
In Perez v. State, 479 So.2d 266 (Fla. 5th DCA 1985), there was conflicting testimony concerning whether the victim was "physically helpless to resist." The jury heard some evidence that the victim communicated her unwillingness to act. However, the victim also testified that Perez hit her in the face breaking her nose and causing much bleeding to occur before she was sexually battered. Thus, the jury heard some evidence which established that the victim was physically unable to effectively communicate her unwillingness to the act. On appeal, the Perez court concluded that there was substantial, competent evidence from which a jury could find the victim was "physically helpless to resist." Id. at 267.
Here, as in Perez, there was conflicting evidence on the question of whether the victim was "physically helpless to resist." The minor victim testified that at times throughout the ordeal she was "passed out" and at all times she was intoxicated. Other testimony established that the child was physically able to communicate.
Based upon this record, a jury could find, and obviously did find, that the combined effects of ingesting a large quantity of cocaine and the fact that she passed out at some point during the sexual battery, rendered the victim physically unable to communicate her unwillingness to the act. Perez v. State, 479 So.2d at 267; see also, State v. Sedia, 614 So.2d 533 (Fla. 4th DCA *1033 1993) (jury could reasonably conclude that victim had no opportunity to communicate her unwillingness to have sexual intercourse with defendant before the alleged penetration).
The majority fails to address that the victim was "physically helpless" to resist, as defined by the statute in its definitional section 794.011(1)(e), because she was sometimes unconscious, and at all times intoxicated.
The majority claims that specific questions regarding the victim's unconsciousness were not asked at Coley's trial. That contention is incorrect. The minor victim testified as follows:
Q. How did it all get started? How did it come about you were put on the bed?
A. I was really messed up. I don't even remember.
* * * * * *
Q. Do you recall how the incident ended?
A. No, I just remember waking up in the morning and I believe I was in my own bed upstairs. I am not sure.
Q. Did you pass out?
A. Yes.
Q. How coked up were you?
A. Really badly.
The majority concludes that, "S.E.M. was neither asleep nor unconscious, for she describes each of the sexual acts on which the State based its case." The majority's reasoning is faulty because it omits significant evidence that the jury found both credible and constituting a charged crime, to wit: often throughout her testimony the victim states, "she does not remember" the details of each act.
It is conceivable that, unlike the majority, which only found unconsciousness after the fact, the jury interpreted this testimony to mean that the victim was at times passed out during the episodes. The issue is one of fact to be determined by the jury. Perez v. State, 479 So.2d at 267; McIlwain v. State, 402 So.2d at 1197. It was so determined, and we must abide by their decision.
The majority dismisses the victim's testimony where she describes passing out, as well as the victim's lapses in memory due to unconsciousness and intoxication. At the same time, the majority attempts to capitalize on those lapses to show that the victim's testimony was somehow inconsistent.
Further, I find that the State proved that the victim was physically helpless to resist within the meaning of the statute, during those episodes when she "blacked out" and was unconscious, or was unable to communicate her unwillingness because of her intoxication. § 794.011(1)(e), Fla. Stat. (1989).
Assuming that the majority's "voluntary intoxication" theory is accepted, the majority fails to address its own inconsistency: how can an intoxicated minor child, even one voluntarily intoxicated, knowingly, freely, and voluntarily consent to an even greater degree of intoxication or to the sexual perversions imposed on her?
Accordingly, any sexual acts perpetrated on the child, after the child's forced ingestion of additional drugs, conform to the statutory definition of "physically helpless to resist" and are sufficient to sustain Coley's conviction. § 794.011(4)(a), Fla. Stat. (1989).

D.

SUFFICIENCY OF EVIDENCE
Coley was charged, tried, and convicted of violating section 794.011(4), Florida Statutes. That section requires the State to prove four elements:
1. Victim was twelve years of age or older.
2. a. Defendant committed an act upon victim in which the sexual organ of the defendant or victim penetrated or had union with the anus, vagina, mouth of the victim or defendant. [or]
b. Defendant committed an act upon victim in which the anus, vagina of victim was penetrated by an object.
3. a. Victim was physically helpless to resist.
* * * * * *

*1034 4. The act was committed without the consent of victim.
Florida Standard Jury Instructions in Criminal Cases, § 794.011(4), Fla. Stat. (1989).
The state proved each of the elements as follows: (1) the victim testified that she was fifteen years old at the time of the offense; (2) the victim and a codefendant of Coley testified to sexual acts where the sexual organs of the victim and Coley had union with the anus, vagina, or mouth of the victim and/or Coley; (3) the victim and a codefendant of Coley testified about the penetration of the anus with an electrical appliance; (4) the victim testified that she was highly intoxicated by cocaine, her faculties had been impaired, and she passed out during the episode; (5) the victim testified that after she was highly intoxicated, Coley and her codefendants administered additional narcotics to the victim; and, (6) the victim testified that all these activities were done without her consent, or with consent obtained after she was intoxicated and unable to give a knowing, intelligent, and voluntary consent.
In Marr v. State, 494 So.2d 1139 (Fla. 1986), the Florida Supreme Court addressed the corroboration necessary to convict in a sexual battery case:
It has been settled law in this state that no corroborative evidence is required in a rape case when the victim can testify to the crime and identify her assailant. We can discern no unique reason why those accused of sexual battery should occupy a status different from those accused of any other crime where the ultimate factual issue at trial pivots on the word of the victim against the word of the accused.
Marr v. State, 494 So.2d at 1139. Here, like in Marr v. State, Coley's conviction ultimately rests on whom the jury believed. Here the jury resolved the ultimate factual questions by believing the victim. Although this record is replete with corroboration, no additional corroborative evidence is legally necessary to affirm this conviction. Marr v. State, 494 So.2d at 1139.

V.

THE BULLINGTON MAJORITY
The majority in Bullington bases its reversal on three theories: (1) actual or implied consent; (2) the victim's ability to articulate an objection and to "use her legs" to indicate any lack of desire to continue the sexual acts; and (3) that even though she "passed out for a period of time during the episode, she was initially a willing participant." I find all three reasons are unsupported by the record and the law.
Assuming we ignore the standard of review, previously discussed in this dissent, there is still no basis to find either actual or implied consent. At the time the sexual episode commenced, the child was already intoxicated beyond any ability to give an intelligent, knowing, and voluntary consent.
The majority concedes this intoxication:
On the day of the incident for which Bullington was convicted, S.E.M. and the others in Bullington's party consumed a large quantity of cocaine.
However, the majority in Bullington, as the majority in Coley, ignores the effect that this initial intoxication had on the validity of the initial consent.
As discussed in the consent section of my dissent to Coley, I can find no valid consent in light of the child's experience, age and intoxication. § 794.011(1), Fla. Stat. (1989); Saavedra v. State, 576 So.2d at 953; In re T.W., 551 So.2d at 1186; Hufham v. State, 400 So.2d at 134; Heiney v. State, 447 So.2d at 210; Jackson v. Virginia, 443 U.S. at 318, 99 S.Ct. at 2788, 61 L.Ed.2d at 560; see also 3 Wharton's, Criminal Law § 299, at 107 (14th ed. 1978); Commonwealth v. Ascolillo, 405 Mass. at 456, 541 N.E.2d at 570.
Additionally, by further intoxicating the child-victim, Bullington ensured that the child would be unable to articulate an objection, withdraw any "consent" given, or in any way obstruct the actions of the adults. Thus, the child's inability to object can not be a proper basis for reversal.
The majority asserts that:

*1035 [A] review of the record reveals that the State offered no evidence to show that the use of cocaine caused the loss of an ability to communicate disapproval of any of the sexual acts.
Yet, the record supports the State's argument that the child was rendered physically helpless by a voluntary consumption of cocaine:
Q. [S], were you conscious throughout the whole period?
A. No.
Q. Tell us what it was like, how much of it you were conscious of and how much were you not?
A. I can't recall. I can't recall a lot of things. I don't recall.
Q. Did you pass out from time to time?
A. Yes.
Q. Did you have any idea how long you were passed out when this happened?
A. No.
* * * * * *
Q. Did you see Harold [Bullington] give any of that cocaine to [the victim]?
A. Yes.
Q. How did he do that?
A. He put a plate under her face.
Q. Could you tell, was [the victim] talking at all?
A. No.
Q. Was she making any sound at all?
A. She was screaming, hollering a little bit, not much.
Further, all the defendants ensured that the child would either willingly submit, or be unable to object, by initially intoxicating the child. Regardless, even if the child initially "willingly" participated in some of the drug use, she testified that she did not consent to the sexual activity which ensued.
Here, the majority chooses to disbelieve the victim's testimony, finding that she consented and willingly participated in all sexual activities. The jury, however, believed the victim, and disbelieved the assertion of consent. We are bound by the jury's findings of fact and we should not supplant their findings of the facts with ours. Heiney v. State, 447 So.2d 210 (Fla.), cert. denied, 469 U.S. 920, 105 S.Ct. 303, 83 L.Ed.2d 237 (1984); Knight v. State, 392 So.2d 337 (Fla. 3d DCA), review denied, 399 So.2d 1143 (Fla. 1981).
The only cases the majority cites do not apply to the facts of this case: Davis v. State, 538 So.2d 515 (Fla. 2d DCA), review denied, 544 So.2d 201 (Fla. 1989), held the requirement that the victim be "physically helpless" was not satisfied simply because the victim could not escape her attacker. Norman v. State, 555 So.2d 1316 (Fla. 5th DCA 1990), held that a victim was not physically helpless to resist when she was able to communicate her unwillingness prior to and during the sexual battery. Here, by virtue of the initial and continued intoxication, the child was unable to communicate her unwillingness, both while conscious and certainly while unconscious.
Further, the majority summarily states:
A review of the record reveals that the State offered no evidence to show that the use of cocaine caused the loss of an ability to communicate a disapproval of any of the sexual acts.
It is evident, and indisputable, that the child could not "communicate" any "disapproval" while she was unconscious (which the Bullington majority admits occurred).

VI.

CONCURRENCE
I concur that the evidence was insufficient to support a conviction for conspiracy to commit sexual battery. Evidence of agreement or intention to commit the crime of sexual battery is not reflected by the record. See § 777.04(3), Fla. Stat. (1989).
Further, although proof of a conspiracy may be inferred from appropriate circumstances, and proof of a formal agreement is not necessary, a conspiracy may not be inferred from aiding and abetting alone. Ashenoff v. State, 391 So.2d 289 (Fla. 3d DCA 1980).
Finally, the State confesses error, and I agree, that Coley's sentence constitutes an impermissible upward departure from the sentencing guidelines. Although courts *1036 are authorized to impose probationary split sentences, Glass v. State, 574 So.2d 1099 (Fla. 1991), the total sentence cannot exceed the sentencing guidelines without providing contemporaneous written reasons for a departure. Robinson v. State, 571 So.2d 429 (Fla. 1990).
Here, the trial court failed to provide written reasons for the departure sentence. Accordingly, the departure sentence cannot stand.

VII.

CONCLUSION
I, along with two juries, do not believe that this child-victim consented to what the Bullington majority calls the "carnal revelry" to which she was so viciously subjected:
Under our scheme of administering justice, the jury resolves factual conflicts, a function quite as important as any single function performed by the court. They take an oath to perform that function no less solemn than that taken by the court to perform its function. When it is shown that they have performed that duty faithfully and honestly and reached a conclusion that squares with reason and their theory of the evidence, it takes more than mere differences in opinion as to what the evidence shows, for this court to reverse them. We find no basis whatever for reversal here, except a possible difference of opinion as to what the facts before the jury reveal.
McKee v. State, 159 Fla. 794, 33 So.2d 50 (1947).
The majority opinions hold that the victim consented to waking up in a bed covered with blood and fecal stained sheets; stripped of dignity, upset, afraid and abandoned. I cannot agree. While these facts are much more complex, this case comes down to one simple point: in my view, a consent to kiss, is not a consent to rape. I therefore respectfully dissent and would affirm the convictions that each majority reverses.
NOTES
[1] Jackson also held that the previous "no evidence" criterion for review of evidentiary sufficiency "is simply inadequate to protect against misapplications of the constitutional standard of reasonable doubt... . `[A] mere modicum of evidence may satisfy a "no evidence" standard.'" Id. at 320 (citation omitted). Under Jackson, the question is "not whether there was any evidence to support a state-court conviction, but whether there was sufficient evidence to justify a rational trier of the facts to find guilt beyond a reasonable doubt." Id. at 312-13 (emphasis in original).
[2] The quotations set forth in part II of the dissent are taken almost entirely from Bullington's case. There are differences between the testimony in the Bullington and Coley cases. Part II of the dissent quotes testimony from the Bullington trial regarding whether the victim passed out from time to time and whether at one point the victim was physically unable to talk. Those questions were not asked at Coley's trial, and there was no testimony at Coley's trial indicating intermittent unconsciousness by the victim or physical inability to speak. The dissent also relies on the testimony of "a friend of the victim," Theresa Smith. Smith did not testify at Coley's trial.
[3] A violation of paragraph 794.011(4)(a) is a first degree felony. Under that statute, consent is a defense to the charge.

At trial the jury was also instructed on the permissive lesser included offense of lewd, lascivious, or indecent assault upon or in the presence of a child in violation of section 800.04, Florida Statutes (1989), a second degree felony. Consent is not a defense to the latter charge.
[4] The "to resist" terminology is also a misnomer. Under the statute, there is no duty for a sexual battery victim to resist a sexual assault. As the Gould summary of elements indicates, under this statute the inquiry is whether the victim consented, not whether the victim resisted. See 577 So.2d at 1304. See generally E. Sue Bernie, Note, Florida's Sexual Battery Statute: Significant Reform But Bias Against The Victim Still Prevails, 30 U.Fla.L.Rev. 419 (1978).
[5] Bullington was actually Lackey's former stepfather, as Bullington and Lackey's mother had divorced.
[6] There is no evidence that S.E.M. was kept with the group against her will. S.E.M. testified that she had the freedom to go and come as she pleased. (Tr. 69).
[7] According to the testimony, there was also an act of anal penetration by vibrator, done by another female participant, not this defendant. (Tr. 104, 129).
[8] Both were called by the State. Lackey had entered into a plea agreement with the State. Both parties argued that Lackey was a truthful witness.
[9] The dissent relies on McIlwain v. State, 402 So.2d 1194 (Fla. 5th DCA 1981), review denied, 412 So.2d 467 (Fla. 1982). There the victim testified specifically about the physical effects of nitrous oxide and testified that he was immobilized thereby. Id. at 1196. The victim's testimony was supported by one of the expert witnesses. Id. The testimony in McIlwain contrasts sharply with the testimony in the present case.

The dissent suggests that there was evidence of unconsciousness. Although S.E.M. testified that she eventually passed out and woke up the next morning, unconsciousness after the fact does not meet the requirements of the statute. The question is physical ability or inability to communicate unwillingness at the time of the acts in question.
[10] Coley argues an additional basis for reversal of the conviction under paragraph 794.011(4)(a)  that the evidence was insufficient to show absence of consent by S.E.M. Given that the conviction must be reversed in any event for the reasons just stated, the issue of consent is deferred for consideration in the next section.
[11] That holding therefore excludes the possibility of reducing the charged offense to the permissive lesser included offense of lewd, lascivious or indecent assault or act upon a child pursuant to section 800.04, Florida Statutes (1989).
[12] Effective for offenses committed on or after April 8, 1992, sexual battery as defined in subsection 794.011(5), Fla. Stat. (Supp. 1992), will also be a necessarily lesser included offense. See ch. 92-135, preamble & s. 3, Laws of Fla. For purposes of the present case, the version of the statute in effect at the time of the charged offenses is controlling, see State v. Smith, 547 So.2d 613, 616-17 (Fla. 1989), as authoritatively construed in Gould. The 1992 amendment is intended to override Gould. Ch. 92-135 (preamble), Laws of Fla. Cf. State v. Lanier, 464 So.2d 1192, 1193 (Fla. 1985) (statute in effect at time of crime is controlling; where supreme court has not previously interpreted statute, supreme court may consider later enacted expression of legislative intent in arriving at authoritative interpretation).
[13] The sexual battery statute provides:

Evidence of the victim's mental incapacity or defect is admissible to prove that the consent was not intelligent, knowing, or voluntary; and the court shall instruct the jury accordingly.
Id. § 794.011(6).
The term "mentally incapacitated" means that a person is rendered temporarily incapable of appraising or controlling his or her conduct due to the influence of a narcotic, anesthetic, or intoxicating substance administered to that person without his or her consent or due to any other act committed upon that person without his or her consent.
Id. § 794.011(1)(c) (emphasis added).
[14] Cf. Commonwealth v. Ascolillo, 405 Mass. 456, 541 N.E.2d 570, 575 (1989) (victim "wholly insensible so as to be unable [to] consent[]... .").

Although it has been suggested that Saavedra v. State, 576 So.2d 953, 959 (Fla. 1st DCA 1991), is pertinent, that case involved the entirely distinct issue of consent to a search under the Fourth Amendment.
[15] The state of defendant's knowledge is pertinent for purposes of the offenses of sexual battery and battery. Consent is not an issue, and lack of knowledge of age is not a defense, under section 800.04, Florida Statutes (1989) (lewd, lascivious, or indecent assault or act upon or in presence of child).
[1] This majority implies that if all the evidence available against Bullington was available against Coley, then they would affirm Coley's conviction. Ironically, Bullington's conviction is also being reversed.
[2] The State has an interest in protecting its children and takes care to evaluate their decisions in light of their ability to make informed decisions:

[D]uring the formative years of childhood and adolescence, minors often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them.
In re. T.W., 551 So.2d 1186 (Fla. 1989) (quoting Belloti v. Baird, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979)).
[3] The majority attempts to distinguish McIlwain from the facts in this case:

There the victim testified specifically about the physical effects of nitrous oxide and testified that he was immobilized thereby ... The victim's testimony was supported by one of the expert witness... The testimony in McIlwain contrasts sharply with the testimony in the present case.
The majority's attempt is faulty.
In Coley, the victim testified specifically about the physical effects of the cocaine ingestion:
Q. How much coke did you use?
A. I can't say.
Q. Did you know what you were doing at that particular point?
A. At first.
Q. You know what was going on around you?
A. At first.
Q. Did it make you sharp and comprehend things around you?
A. No.
The victim's testimony was supported by another witness:
Q. And did [the victim] say no to any of this?
A. No.
Q. Did she have an opportunity to say no?
A. She had an opportunity to say no but she was all coked out.
* * * * * *
Q. So she remembered what took place?
A. I don't know. She knew what had been done. As far as details, I didn't think she knew the details. She was coked out.